## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| KEITH A. BROWN, | Case No. 1:17-cv-00160-BLW |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| KEITH YORDY, et al., | |
| Defendants. | |

### INTRODUCTION

Before the Court are six motions, each of which pertain to Plaintiff's and

Defendants' cross-motions for summary judgment.  The motions are fully briefed.

For the reasons set forth below, the Court grants in part and denies in part

Defendants' motion for summary judgment and denies Plaintiff's motion for

summary judgment.[1]

---

[1] The motions before the Court include Plaintiff's Motion for Summary Judgment (Dkt. 59); Defendants' Motion for Summary Judgment (Dkt. 62); Plaintiff's Motion to Dismiss Defendant's [*sic*] Motion for Summary Judgment as Filed Untimely (Dkt. 68); Plaintiff's Motion under Rule 56, (d), [*sic*] of the Federal Rules of Civil Procedure (Dkt. 72); Plaintiff's Motion for Judgment (Dkt. 73); Plaintiff's Motion to Strike the Defendants [*sic*] Motion for Extension of (Continued)

# FACTUAL BACKGROUND

The facts of this case are set out in the Initial Review Order written by Magistrate Judge Dale (Dkt. 21); the Court's Successive Review Order (Dkt. 26) and Memorandum Decision & Order (Dkt. 71); and the Ninth Circuit's Memorandum Disposition (Dkt. 33). The Court limits its recitation of the facts to those necessary for its decision.

Plaintiff Keith Brown is an inmate housed by the Idaho Department of Corrections at the Idaho State Maximum Security Institution ("ISMI"). Dkt. 5 at

---

time, Filed on December 5th, 2019, as Untimely (Dkt. 83).

Plaintiff's Motion to Dismiss Defendant's [*sic*] Motion for Summary Judgment as Filed Untimely (Dkt. 68) is denied because Defendants' motion was timely filed on October 15, 2018, pursuant to Federal Rule of Civil Procedure 6(a)(C).

Plaintiff's Motion under Rule 56, (d), [*sic*] of the Federal Rules of Civil Procedure seeks an order from this Court requiring non-party prison officials to review and sign declarations prepared by Plaintiff establishing that the condition Plaintiff was held in were "identical to the conditions of confinement at the Ohio Super-max prison" described in *Wilkinson v. Austin*. Dkt. 72 at 5. Plaintiff could have sought these declarations before discovery closed on September 15, 2019, but failed to do so. *See* Dkt. 72-5. Furthermore, the relief sought by Plaintiff (signed declarations from non-parties) is not appropriate under Rule 56(d). Accordingly, Plaintiff's motion is denied.

Plaintiff's Motion for Judgment (Dkt. 73) is denied because Defendants' opposition was timely filed on October 13, 2019. Although the service copy of the filing did not reach Plaintiff until November 14, 2019, due to apparent errors in the prison mailing system (Dkt. 74), the Court will not grant Plaintiff judgment on the basis of a simple service error, especially where the original filing was timely and Plaintiff was not prejudiced.

Finally, Plaintiff's Motion to Strike the Defendants [*sic*] Motion for Extension of time, Filed on December 5th, 2019, as Untimely (Dkt. 83) is denied. Defendants' concede their response was untimely by two days (Dkt 83). Though the Court is concerned about defense counsel's repeated missteps (*e.g.*, failing to ensure that Plaintiff received a service copy, failing to change titles to motions, and failing to meet filing deadlines), the Court will consider Defendants' opposition and denies Plaintiff's motion.

2.B.  Prior to the events giving rise to this litigation, Plaintiff was housed at the Idaho State Correctional Institute ("ISCI").  *Id.*  In addition to being an inmate, Plaintiff was also a class representative in the ongoing *Balla* litigation involving prison conditions at ISCI.  Dkt. 62-7, Yordy Decl., ¶ 5.

### 1.  June DOR

In June 2016, Plaintiff was issued a Class A Disciplinary Offense Report ("DOR") because a drug test he had taken came back as positive for methamphetamine.  Yordy Decl., Ex. 3, p. 42.  Brown was placed in ISCI's restrictive housing unit pending his hearing.  Dkt. 62-5, Seely Decl., ¶ 5.  Prior to the hearing, Plaintiff requested that a staff hearing assistant gather witness statements from an offsite optometrist; a nurse in IDOC's optometry department, Nurse Kelly; and from the company that evaluated Plaintiff's drug test.  Seely Decl., Ex. 1, p. 1.  Plaintiff argued that the positive test result was a false positive caused by eyedrops that were administered to him.  *Id.*

No staff assistant was appointed, but Defendant Corey Seely, the presiding Disciplinary Hearing Officer, contacted Nurse Kelly who, after consulting the offsite optometrist, informed Seely that the eyedrops could not cause a false positive.  *Id.* ¶ 7.

The disciplinary hearing was convened on July 6, 2016.  Seely Decl. ¶ 3.

Plaintiff argued that the level of methamphetamine discovered by the test was below the allowable limit and that the charges were untimely due to a delay in service of the DOR. Seely Decl. ¶¶ 11-12. Seely rejected both arguments. *Id.* Plaintiff also argued that the test was a false positive that resulted from eye drops that had been administered to Plaintiff. Seely rejected this argument as well, found that the DOR was supported by evidence, and sentenced Plaintiff to a 20-day period in restrictive housing. Seely Decl. ¶ 15.

Plaintiff appealed Seely's determination, but Defendant Keith Yordy upheld Seely's findings on July 28. Yordy Decl. ¶ 17. Ordinarily, Plaintiff's violation would have required that he be transferred out of ISCI to a more restrictive facility. *Id.* ¶ 19. But Yordy, pursuant to his discretion and due to Plaintiff's status as a *Balla* representative, agreed to Plaintiff's request to stay at ISCI. *Id.* ¶ 20. After spending 30 days in segregation—Plaintiff spent an additional ten days beyond the 20-day sanction imposed by Seely because no space was available in ISCI—Plaintiff returned to the custody conditions that he was subject to prior to the June DOR. *Id.* ¶ 21.

## 2. October DOR

Plaintiff was returned to restrictive housing in late September as part of an IDOC investigation into a conspiracy to smuggle methamphetamine into ISCI. *Id.*

According to Officer Bryan Adams, Plaintiff's telephone conversations with Catherin Paterson in early September 2016 were recorded.  Adams Decl. ¶ 11. During those conversations, Plaintiff instructed Paterson about how and where to smuggle methamphetamine into ISCI.  *Id.*  Adams recognized Plaintiff's voice on the recordings.  *Id.*  And, on September 20, 2016, Paterson was arrested trying to smuggle 56 grams of methamphetamine into the prison.  *Id.* ¶ 12.  The investigation also revealed that two other inmates, Matt Heinzman—Paterson's son—and Sean Patterson, were involved in the conspiracy.  *Id.* ¶¶ 18-19.

Class A DORs were filed against Plaintiff, Heinzman, and Patterson in early October.  *Id.* ¶¶ 17-19.  Prior to his hearing, Plaintiff requested that a staff hearing assistant be appointed.  Ramirez Decl. ¶ 5.  A staff hearing assistant was appointed. *Id.*  Plaintiff asked the staff hearing assistant to gather witness statements from Heinzman and IDOC Central Office staff member Amanda Weed.  Ramirez Decl., Ex. 1, P. 4.  Weed declined to give a statement, but Heinzman gave a statement indicating that he used Plaintiff's telephone pin code with Plaintiff's permission. Ramirez Decl. ¶ 6.

Ramirez held a disciplinary hearing on October 6, 2016.  *Id.* ¶ 7.  Plaintiff argued that his conduct did not merit a Class A designation and that Heinzman was the party who was recorded talking to Paterson.  *Id.* ¶ 8-11.  At Plaintiff's request,

Ramirez listened to the recordings; but Ramirez concluded based on Plaintiff's voice that it was Plaintiff on the phone with Paterson, not Heinzman.  *Id.* ¶ 11-13. Having identified Plaintiff's voice, Ramirez did not investigate whether other inmates had, in fact, been using Plaintiff's pin to make phone calls.  *Id.* ¶ 13. Ramirez imposed a 15-day detention period and a 30-day commissary restriction as a sanction.  *Id.* ¶ 14.  Both of Plaintiff's co-conspirators, Heinzman and Patterson, received identical sanctions.  Yordy Decl. ¶ 30.

Yordy denied Plaintiff's appeal of the October DOR on October 16.  *Id.* ¶ 29.  Unlike Plaintiff's prior DOR, Yordy declined to exercise his discretion to override Plaintiff's transfer out of ISCI to a more secure facility.  *Id.* ¶ 32.

### 3.  Plaintiff's Parole Eligibility

Parole eligibility in Idaho is controlled by the Idaho Commission of Pardons and Parole ("ICPP"), which is a separate agency from IDOC.  In September 2016, just three months after the June DOR and one month prior to the October DOR, the ICPP gave Plaintiff a tentative parole date of June 19, 2017—one year from the date of the June DOR.  Dkt. 75-20.  The ICPP subsequently voided that date after it reviewed a copy of Plaintiff's October DOR.  *Id.*

## LEGAL STANDARD

### 1.  Summary Judgment Standard

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). There must be a genuine dispute as to any material fact – a fact "that may affect the outcome of the case." *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

When cross-motions for summary judgment are filed, the Court must independently search the record for factual disputes. *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The filing of cross-motions for summary judgment—where both parties essentially assert that there are no material factual disputes—does not vitiate the court's responsibility to determine whether disputes as to material fact are present. *Id.* The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000). This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Deveraux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex*, 477 U.S. at 324.

The Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch.*

*Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quotation omitted).  Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts."  *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

### 2. Due Process Standard

The right to procedural due process of law under the Fourteenth Amendment prohibits the government from depriving an individual of a liberty or property interest without following the proper procedures for doing so.  *Wolff v. McDonnell*, 418 U.S. 539, 558-66 (1974).  To succeed on a procedural due process claim, a prisoner must establish (1) that he possessed a liberty interest and (2) that the defendants deprived him of that interest as a result of insufficient process. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).

Prisoners have a liberty interest in avoiding detention in supermax facilities in which they are disqualified from seeking parole and are deprived of almost all human contact.  *See Wilkinson*, 545 U.S. at 223–225.  Before a prisoner can be sent to such a facility, they must be afforded the opportunity to "call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals."  *Wolff*, 418 U.S. at 566.  But the right to call witnesses and present evidence is not unlimited.  *See*

*id.* "Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence." *Id.* According to the Supreme Court:

> Many prison officials, on the spot and with the responsibility for the safety of inmates and staff, are reluctant to extend the unqualified right to call witnesses; and in our view, they must have the necessary discretion without being subject to unduly crippling constitutional impediments. There is this much play in the joints of the Due Process Clause, and we stop short of imposing a more demanding rule with respect to witnesses and documents.

*Id.* at 566–67; *see also Wolf v. Tewalt*, No. 1:20-CV-00259-BLW, 2020 WL 4736297, at *7 (D. Idaho Aug. 14, 2020) (Winmill, J.) (rejecting a claim under *Wolff v. McDonnell* because the prisoner had notice of the ad-seg review hearing and "an informal, nonadversarial process" was used to determine whether ad-seg was appropriate).

### 3.  Equal Protection Standard

"[T]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (internal citation and quotation marks omitted).

Under the Equal Protection Clause, "all persons similarly circumstanced shall be treated alike" by governmental entities.  *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920).  However, "[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Tigner v. Texas*, 310 U.S. 141, 147 (1940).  A plaintiff bringing an equal protection claim must show (1) intentional discrimination due to membership in a protected class or that (2) similarly situated individuals were treated differently.  *See Thornton v. City of St. Helens*, 425 F.3d 1158, 1166 (9th Cir. 2005).

Even where similarly situated persons are treated differently by the state, "state action is presumed constitutional and 'will not be set aside if any set of facts reasonably may be conceived to justify it.'"  *More v. Farrier*, 984 F.2d 269, 271 (9th Cir. 1993) (quoting *McGowan v. Maryland*, 366 U.S. 420, 426 (1961)). Absent evidence of invidious discrimination, the federal courts should defer to the judgment of prison officials.  *See id.* at 277; *Youngbear v. Thalacker*, 174 F. Supp. 2d 902, 916 (D. Iowa 2001) ("There can be no 'negligent' violations of an individual's right to equal protection.").

Equal protection claims alleging disparate treatment or classifications generally are subject to a heightened standard of scrutiny if they involve a "suspect" or "quasi-suspect" class, such as race, national origin, or sex, or when

they involve a burden on the exercise of fundamental personal rights protected by the Constitution.  *See, e.g., City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985).  Inmates are not a protected class under the Equal Protection Clause.  *Webber v. Crabtree*, 158 F.3d 460, 461 (9th Cir. 1998).

Accordingly, claims of dissimilar treatment of inmates are subject to rational basis review.  *See Heller v. Doe*, 509 U.S. 312, 319–20 (1993).  In a rational basis analysis, the relevant inquiry is whether Defendants' action is "patently arbitrary and bears no rational relationship to a legitimate governmental interest."  *Vermouth v. Corrothers*, 827 F.2d 599, 602 (9th Cir. 1987) (quotation omitted).  Under this rational basis test, Plaintiff can prevail only if he is similarly situated with persons who are treated differently by Defendants, and if Defendants have no rational basis for the disparate treatment.  Stated another way, prison officials need show only a rational basis for dissimilar treatment in order to defeat the merits of Plaintiff's claim.  *Id.*

In addition to the deference inherent in a rational basis inquiry, an additional layer of deference to prison officials is required under *Turner v. Safley*, 482 U.S. 78, 89-91 (1987), which holds that a prison regulation is constitutional so long as it is reasonably related to a legitimate penological purpose.  *See Walker v. Gomez*, 370 F.3d 969, 974 (9th Cir. 2004) ("In the prison context, . . . even fundamental

rights such as the right to equal protection are judged by a standard of reasonableness—specifically, whether the actions of prison officials are reasonably related to legitimate penological interests." (quotation omitted)).

### 4. First Amendment Standard

A prisoner alleges a sufficient claim for retaliation when he or she (1) asserts that the prison officials "took an adverse action" (2) "because of" (3) his or her "protected conduct, and that such action" (4) "chilled the inmate's exercise of his or her First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 568 (9th Cir. 2005) (footnote omitted). Plaintiff "bears the burden of proving the absence of legitimate correctional goals for the conduct of which he [or she] complains." *Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003) (Trott, J.). Where prison officials act with a mixed motive in taking an adverse action—one legitimate and one unconstitutional—they may not escape liability even though the plaintiff "*arguably*" deserved the punishment. *See id.* ("But, if, in fact, the defendants abused the gang validation procedure as a cover or a ruse to silence and punish Bruce because he filed grievances, they cannot assert that Bruce's validation served a valid penological purpose, even though he may have arguably ended up where he belonged.").

## 5.  Qualified Immunity Standard

The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 731, (2002).  In order to hurdle a defendant's claim of qualified immunity, a plaintiff must satisfy a two-part test.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001). First, the Court must consider whether the plaintiff's allegations, taken as true, establish a constitutional violation.  *Id.*  Secondly, if such allegations do establish a constitutional violation, the Court must determine whether the right was clearly established.  *Id.* at 202.

## 6.  Supervisory Liability Standard

A defendant may be held liable as a supervisor under § 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation."  *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011).  "A plaintiff must show the supervisor breached a duty to plaintiff which was the proximate cause of the injury.  The law clearly allows actions against supervisors under section 1983 as long as a sufficient causal connection is present, and the

plaintiff was deprived under color of law of a federally secured right." *Id.* (quoting *Redman v. Cnty. of San Diego*, 942 F.2d 1435, 1447 (9th Cir. 1991) (en banc)).

"The requisite causal connection can be established . . . by setting in motion a series of acts by others," or by "knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury." *Id.* (quoting *Dubner v. City & Cnty. of San Francisco*, 266 F.3d 959, 968 (9th Cir. 2001)). "A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervisor, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Id.* at 1208.

## ANALYSIS

### 1. All Defendants Are Entitled To Summary Judgment On The Merits Of Plaintiff's Procedural Due Process Claim

The Court begins with Plaintiff's procedural due process claim. To succeed on a procedural due process claim, a prisoner must establish (1) that he possessed a liberty interest and (2) that the defendants deprived him of that interest as a result of insufficient process. *Wilkinson*, 545 U.S. at 223–225.

#### A. Plaintiff Has Not Created An Issue Of Material Fact As To Whether He Was Denied A Liberty Interest

The Court begins with the question of whether Plaintiff has alleged a deprivation of a liberty interest.  In *Wilkinson*, the Supreme Court held that an inmate had a liberty interest in avoiding assignment to a supermax prison because such an assignment "impose[d] an atypical and significant hardship on an inmate in relation to ordinary incidents of prison life."  *Id.* at 223.  In arriving at this conclusion, the Supreme Court noted that:

> For an inmate placed in . . . [a supermax facility], almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room.

*Id.* at 223-24.  Furthermore, the prisoner in *Wilkinson* was subject to indefinite detention in the supermax facility and placement at the facility disqualified the prisoner from parole consideration.  *Id.* at 224.

Plaintiff alleges that the conditions in which he is currently held at ISMI are equivalent to the conditions described by the Supreme Court in *Wilkinson*.  Dkt. 75-9.  Plaintiff has produced two additional declarations from fellow inmates detailing the conditions in which they are held.  Both inmates claim that (1) they are locked in their cells 23 hours a day, (2) no human contact is allowed, (3) exercise is limited to one hour per day roughly three days out of every week.  Dkts. 75-10, 75-11.

Defendants put forth a starkly different picture regarding the conditions of

confinement in which Plaintiff was held at ISCI and ISMI. According to

Defendants, the conditions in which Plaintiff was held at ISCI in its restrictive

housing unit (Unit 8):

> are not comparable to so-called supermax prisons. Inmates on Unit 8 are not isolated from all human contact, they still have recreation time of at least one hour a day, 5 days a week and a shower 3 times a week. Each cell has a window in the door and a second window in the back of the cell with a view to outside. 13 cells line each side of the tier, leaving about 8 feet between them. Inmates routinely stand at their window and talk to other inmates across the corridor. They also regularly converse with inmates housed on each side of them. Correctional Officers conduct security checks every 30-minutes often talking with them and answering questions. Officers serve meals 3 times a day, pass out mail, laundry and other supplies daily. Nursing staff conduct daily health checks, visually and verbally talking with each inmate. Inmates are routinely brought out for medical appointments or sick call. Shift commanders are required to walk all segregation tiers every shift. Other staff such as clinicians, case managers, paralegal, property officers and administration regularly walk the tiers and visit with inmates. Inmates are not placed on Unit 8 indefinitely for disciplinary purposes. Per the IDOC Disciplinary SOP, the longest an inmate can be placed in disciplinary detention is 30 days. Placement in Unit 8 does not automatically disqualify an individual for parole.

Yordy Decl. ¶ 34.  The conditions at ISMI, while more restrictive, also fall short of

supermax conditions according to Defendants:

> IMSI close custody general population inmates have one and a half hours of outside recreation time per day and one and a half hours in the dayroom seven days per week. Outdoor recreation in the ballfield is provided subject to weather and other conditions. In the dayroom, inmates have access to microwave, showers, inmate barbers, telephones, Jpay kiosks, tables and exercise equipment such as pull up bars and dip stations. Close custody inmates have access to email, video grams, digital photos, eCards, digital music, video games, a JP5 digital tablet and accessories—all for purchase.

They also have access to the commissary to purchase supplemental hygiene products, food, electronics, and clothing. Close Custody inmates also have access to visits once a week with approved visitors. These visits may last up to two hours. More than one visit a week may be approved for special circumstances such as visitors traveling long distances.

Each general population close custody cell at IMSI has a window in the door and a second window with a view of the outside in the back of the cell. Inmates are typically housed two to a cell and afforded all property items by policy. They also can regularly converse with inmates housed on each side of them. Correctional Officers conduct security checks every 60- minutes often talking with them and answering questions. Daily, officers pass out mail, laundry and other supplies. Nursing staff conduct daily health checks and inmates are routinely brought out for medical appointments or sick call. Other staff such as clinicians, case managers, paralegal, property officers and administration regularly walk the tiers and visit with inmates.

Yordy Decl. ¶¶ 35-36.

Although the Court cannot reconcile the divergent descriptions of the conditions of confinement offered by Plaintiff, his fellow inmates, and Defendants, it notes that Plaintiff has not argued that his confinement in ISMI automatically disqualified him from parole. *Contra Wilkinson*, 545 U.S. at 224. Nor could he. Defendant's tentative parole date was revoked by the ICPP in October 2016, a full four months prior to Defendant being transferred from ISCI to ISMI. *See* Yordy Decl. ¶ 22; Dkt. 75-20. Because the Supreme Court's finding of a liberty interest in *Wilkinson* was contingent on the fact that the prisoner's detention in facility "disqualifie[d] an otherwise eligible inmate [from] parole consideration," the Court finds that summary judgment in Defendants' favor is appropriate. *See id.*; *see also*

*Sandin v. Connor*, 515 U.S. 472, 486 (1995) ("We hold that . . . [a prisoner's

detention] in segregated confinement did not present the type of atypical,

significant deprivation in which a State might conceivably create a liberty

interest.").

### B. Plaintiff Was Not Denied Due Process Regarding The June Or October DORs

The Supreme Court has made clear that while prisoners must be afforded the

right to call witnesses and present evidence, that right is not unlimited.  *See Wolff*,

418 U.S. at 566.  "Prison officials must have the necessary discretion to keep the

hearing within reasonable limits and to refuse to call witnesses that may create a

risk of reprisal or undermine authority, as well as to limit access to other inmates to

collect statements or to compile other documentary evidence."  *Id.*

For the June DOR relating to Plaintiff having tested positive for

methamphetamine consumption, Plaintiff asked for a staff hearing assistant to

contact a specific nurse in the medical unit, Nurse Kelly, along with Plaintiff's

treating optometrist and the drug testing facility.  Seely Decl., Ex. 1, p. 1.  Plaintiff

argued that the positive test result was a false positive caused by eyedrops that

were administered to him.  *Id.*

No staff assistant was appointed, but Seely, the presiding DHO, contacted

Nurse Kelly who, after consulting the Plaintiff's treating optometrist, informed

Seely that the eyedrops could not cause a false positive.  *Id.* ¶ 7.  Seely did not

contact the lab facility.  Seely found that evidence supported the DOR, rejected

Plaintiff's alternative arguments, and sanctioned Plaintiff to 20 days in

administrative segregation.  Seely Decl. ¶¶ 11-12, 15.  Yordy affirmed the

sanction.  Yordy Decl. ¶ 17.

Roughly six months after he had served the sanction, Plaintiff contacted the

class counsel in the *Balla* litigation, Elijah Watkins, who contacted the drug testing

facility.  Dkt. 75-3.  The drug testing facility, in turn, confirmed that the use of

pseudo-ephedrine eye drops could, depending on the type of urinalysis test used,

have caused a false positive.  *Id.*

While a close call, the Court finds that Defendants are entitled to summary

judgment on the June DOR.  It's true that Seely, who took on the role of hearing

staff assistant for himself, failed to call the drug testing facility as Plaintiff

requested and, as a result, failed to uncover potentially exculpatory evidence.  But

Seely's decision was hardly unreasonable.  After all, he had statements from a

nurse and the optometrist that treated Plaintiff that the eyedrops which had been

administered to Plaintiff *could not* have caused a positive test.  Seely Decl., Ex. 1,

p. 1.  Accordingly, the Court finds that summary judgment is appropriate on the

June DOR.  *See Wolff*, 418 U.S. at 566.

The October DOR is more clear cut.  Prior to the hearing, Plaintiff asked the staff hearing assistant to gather witness statements from Heinzman and IDOC Central Office staff member Amanda Weed.  Ramirez Decl., Ex. 1, P. 4.  Weed declined to give a statement, but Heinzman gave a statement indicating that he had used Plaintiff's telephone pin code with Plaintiff's permission.  Ramirez Decl. ¶ 6.

At the disciplinary hearing, Plaintiff argued that his conduct did not merit a Class A designation and that Heinzman was in fact the party who was recorded talking to Paterson.  *Id.* ¶ 8-11.  At Plaintiff's request, Ramirez listened to the recordings; but Ramirez concluded based on Plaintiff's voice that it was Plaintiff on the phone with Paterson, not Heinzman.  *Id.* ¶ 11-13.  Having identified that Plaintiff's voice, Ramirez did not investigate whether other inmates had, in fact, been using Plaintiff's pin to make phone calls.  *Id.* ¶ 13.  Yordy denied Plaintiff's appeal of the October DOR on October 16.  *Id.* ¶ 29.  This series of events is more than sufficient to meet Plaintiff's procedural due process right.

## 2.  All Defendants Are Entitled To Summary Judgment On The Merits Of Plaintiff's Equal Protection Claim

The Court now turns to Plaintiff's Equal Protection claim.  A plaintiff bringing an equal protection claim must show (1) intentional discrimination due to membership in a protected class or that (2) similarly situated individuals were treated differently.  *See Thornton v. City of St. Helens*, 425 F.3d 1158, 1166 (9th

Cir. 2005).  Plaintiff does not belong to a protected class, and accordingly must proceed under the second prong.

Plaintiff has failed to create an issue of material fact regarding his Equal Protection claim, which relates solely to the October DOR.  *See Brown v. Yordy*, 738 F. App'x 482, 483 (9th Cir. 2018).  Plaintiff's co-conspirators, Heinzman and Patterson, received identical sanctions even though they were not *Balla* representatives.  Yordy Decl. ¶ 30.  Because Plaintiff received the same treatment as his co-conspirators, his Equal Protection Claim fails.  *See Bruce*, 351 F.3d at 1289 (Trott, J.).

### 3. Defendants Are Not Entitled To Summary Judgment On The Merits Of Plaintiff's First Amendment Claim

Turning to the First Amendment retaliation claim, Plaintiff must show (1) that the prison officials "took an adverse action" (2) "because of" (3) his "protected conduct, and that such action" (4) "chilled the inmate's exercise of his . . . First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  *Rhodes*, 408 F.3d 568. (footnote omitted).  Plaintiff "bears the burden of pleading proving the absence of legitimate correctional goals for the conduct of which he [or she] complains."  *Id.*

Defendants seek summary judgment on the second and fifth elements.  They argue Plaintiff cannot establish "but for" causation between the prison officials'

animus and his claimed injury.  Dkt. 62-1 p. 17-18.  Second, they argue that they

had a legitimate penological interest in punishing Plaintiff; namely, to discourage

efforts to smuggle drugs into prison facilities.  *Id.* at 18.  Both arguments hinge on

Defendants' contention that because there was a legitimate reason to punish

Plaintiff, *i.e.* his drug smuggling activities, then his retaliation claim cannot survive

summary judgment.

Defendants arguments are misguided.  In *Bruce*, the defendants argued that

that because there was some evidence that the inmate, Bruce, was a gang member,

then his designation as a gang member could not give rise to a First Amendment

retaliation claim.  351 F.3d at 1288-89.  Reversing the lower court's grant of

summary judgment, Judge Trott's opinion swiftly rejected that argument:

> if, in fact, the defendants abused the gang validation procedure as a cover or
> a ruse to silence and punish Bruce because he filed grievances, they cannot
> assert that Bruce's validation served a valid penological purpose, even
> though he may have arguably ended up where he belonged.

*Id.* at 1289; *see also Cornell v. Woods*, 69 F.3d 1383, 1388–89 (8th Cir. 1995);

*Woods v. Smith*, 60 F.3d 1161, 1165 (5th Cir. 1995); *Smith v. Maschner*, 899 F.2d

940, 948–49 (10 Cir. 1990).

Here, the allegation is that prison officials punished Plaintiff for serving as a

class representative in *Balla*.  The declarations from Plaintiff's fellow inmates state

that prison officials negatively referred to Plaintiff as "Balla Brown."  Dkts. 72-10,

72-11.  Furthermore, Plaintiff states that during the October DOR hearing, the DHO, Ramirez, commented that Plaintiff was being held to a higher standard because he was a *Balla* representative.  *See* Dkt. 62-1 p. 18.  Ramirez disputes making this statement, but whether it occurred or not is a matter for the jury to decide.  Ultimately, the jury must decide what was in the minds of the Defendants at the time they punished Plaintiff for the October DOR.

### 4. All Defendants Are Entitled To Qualified Immunity On The Due Process And Equal Protection Claims, But Not The First Amendment Claim

The Court now turns to the question of whether Defendants are entitled to qualified immunity for Plaintiff's claims.  Qualified immunity involves a two-part test.  *Katz*, 533 U.S. at 201.  First, the Court must consider whether the plaintiff's allegations, taken as true, establish a constitutional violation.  *Id.*  Secondly, if such allegations do establish a constitutional violation, the Court must determine whether the right was clearly established.  *Id.* at 202.

Under the first prong, all defendants are entitled to qualified immunity on Plaintiff's Procedural Due Process and Equal Protection claims.  *Supra* p. 15-22.  Plaintiff has established, however, that issues of material fact exist as to his First Amendment claim, thereby satisfying the first prong of the qualified immunity analysis.  *Supra* 22-24.

Turning the clearly established prong, Plaintiff cites only two cases in his opposition to Defendants' motion for summary judgment: *Wilkinson* and *Morrissey v. Brewer*, 408 U.S. 471 (1972). Dkt. 78-1. Neither case clearly establishes a viable Due Process, Equal Protection, or First Amendment claim based on the unique facts of this case. *Wilkinson*, as discussed, dealt only with a procedural due process claim. 545 U.S. at 213. And *Morrissey* dealt with due process in parole proceedings. 408 U.S. at 472. Neither case dealt with the unique set of facts put forth by Plaintiff.

But during its analysis of the merits of Plaintiff's First Amendment claim, the Court reviewed *Bruce*. There, the officers argued that they were entitled to qualified immunity on the prisoner's First Amendment retaliation claim. 351 F.3d at 1290. The Ninth Circuit rejected that argument, noting that it had clearly established a prohibition against retaliatory punishment since at least 1995. *Id.* Although the Court is not required to comb through the case law on its own to determine whether the right at issue has been clearly established, *c.f. Carmen*, 237 F.3d at 1029, it will not turn a blind eye to the Ninth Circuit's case law, particularly because Plaintiff is a pro se prisoner. Accordingly, the Court denies Defendants' motion for summary judgment on qualified immunity grounds for Plaintiff's First Amendment claim.

**5.  Defendants Kempf And Zmuda Are Entitled To Summary Judgment As Supervisors**

Next, the Court turns to Defendants' argument that Kempf and Zmuda are entitled to summary judgment because their connection to the events giving rise to the alleged constitutional deprivations suffered by Plaintiff were too tenuous. Kempf was the IDOC's Director during the time in which Plaintiff received both of the DORs; Zmuda was the Deputy Director.  A defendant may be held liable as a supervisor under § 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation."  *Starr*, 652 F.3d at 1207.  "The requisite causal connection can be established . . . by setting in motion a series of acts by others," or by "knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury."  *Id.* (quoting *Dubner v. City & Cnty. of San Francisco*, 266 F.3d 959, 968 (9th Cir. 2001)).

Plaintiff does not come close to creating an issue of material fact with respect to whether Kempf or Zmuda caused his injury.  Plaintiff's sole argument is that he sent Kempf and Zmuda letters *after* his DOR hearings, in which he told them about the alleged deficiencies.  Dkt. 78-4, Exh. M (letter to Kempf); Dkt. 78-5, Exh. N (letter to Zmuda).  But these letters, on their own, do not show that

Kempf or Zmuda were personally involved with the deprivation of Plaintiff's rights.  In other words, their failure to act on the letters does not, in and of itself, equal a constitutional violation.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (observing that supervisory liability only occurs where the "official's own individual actions . . . violated the constitution").

### 6.  Plaintiff Is Not Entitled To Summary Judgment

Finally, the Court has reviewed Plaintiff's motion for summary judgment.  Dkt, 59.  The motion predominantly relates to Plaintiff's Procedural Due Process claim. *Id.*  As discussed, Defendants, rather than Plaintiff, are entitled to summary judgment on Plaintiff's Procedural Due Process claim.  To the extent Plaintiff sought summary judgment on his Equal Protection and First Amendment claims, that request is denied.  Defendants are entitled to entitled to summary judgment on the Equal Protection claim, and the First Amendment claim contains fact disputes– for example, what the Defendants' intent was in punishing Plaintiff–that prohibits summary judgment.

### ORDER

**IT IS ORDERED that:**

1.  Plaintiff's Motion for Summary Judgment (Dkt. 59) is **denied**;

2. Defendants' Motion for Summary Judgment (Dkt. 62) is **granted in part and denied in part**;

3. Plaintiff's Motion to Dismiss Defendant's [*sic*] Motion for Summary Judgment as Filed Untimely (Dkt. 68) is **denied**;

4. Plaintiff's Motion under Rule 56, (d), [*sic*] of the Federal Rules of Civil Procedure (Dkt. 72) is **denied**;

5. Plaintiff's Motion for Judgment (Dkt. 73) is **denied**;

6. Plaintiff's Motion to Strike the Defendants [*sic*] Motion for Extension of time, Filed on December 5th, 2019, as Untimely (Dkt. 83) is **denied**.

DATED: September 30, 2020

B. Lynn Winmill
U.S. District Court Judge